Dennis EDDINS

v.

**WEST GEORGIA MEDICAL CENTER, INC.**

Civ. A. No. C83–167N.

United States District Court,
N.D. Georgia,
Newnan Division.

July 10, 1985.
On Motions To Amend Aug. 22, 1985.

Janet Hill, Nelson & Sweat, Athens, Ga., for plaintiff.

Bennet Alsher, Clark, Paul, Hoover & Mallard, Atlanta, Ga., for defendant.

## ORDER

G. ERNEST TIDWELL, District Judge.

The above-styled matter came for trial before the court without a jury on March 27–29, 1985. This order constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

### FINDINGS OF FACT

**1.**

Plaintiff Dennis Eddins is a black male, citizen of the United States and a resident of the State of Georgia. Defendant West Georgia Medical Center, Inc. is located in LaGrange, Georgia. Both parties agree that the facts concerning the Hospital's governmental connections are the same as were presented in *Gilbert v. West Georgia Medical Center, Inc.*, 629 F.Supp. 738 (N.D.Ga.).

**2.**

Plaintiff alleges that the defendant discriminated against him by failing to hire him into a clerical position; by failing to promote him to the position of unit secretary/monitor technician in the coronary care unit; by retaliating against him because he filed a grievance; and by discharging him. The court will address each of these claims separately.

*Hiring Claim:*

**3.**

Plaintiff applied for a job with the defendant Hospital on or about December 31, 1981. His referral card from the State Unemployment Service, stated "transporter or any" position. He specifically asked that he be considered for vacant clerical positions, but was told by a Personnel Department employee that no clerical positions were available. In the section marked "Employment Desired" on the official hospital application form, plaintiff wrote "transporter".

**4.**

Defendant denied plaintiff the opportunity to apply for a clerical position even though it accepted applications from approximately 78 persons for clerical positions between December 31, 1981 and March 24, 1982. In addition, defendant hired at least 12 persons into clerical positions during that time period. Of the 12 people hired into clerical positions during this time period only one was black.

**5.**

The defendant alleges that the plaintiff was not as qualified as the 12 persons hired into clerical positions. After examining the applications of those persons and the plaintiff and hearing the evidence at trial the court finds that the plaintiff was equally or better qualified than many of the white persons hired into clerical positions from January, 1982 through March, 1982.

**6.**

The reason articulated by the defendant for not hiring plaintiff into a clerical position was that he did not indicate on his application that he wanted a clerical position and that the Hospital had a policy of only considering applicants for the job which they indicated on their application. The evidence indicated, however, that this policy was not uniformly followed. The evidence showed that a number of applicants who indicated "any position" on their applications were considered for clerical positions. Velma Vaughn applied for "anything except clerical" and was considered for the position of ward clerk. Anne Ruth Worthy and Theresa Fricks applied for "any office" and were hired in clerical positions. Chris Elmer Hester applied for "environmental services" and was hired as a pharmacy technician, a clerical position. Although plaintiff's application listed transporter position, he was considered for and hired as a Nurse's Assistant. The record reveals that no objective standards or policies regarding hiring exist and that any internal procedures established by the defendant are not consistently followed.

**7.**

The defendant hospital employs in excess of 700 employees. Approximately 30% of those employees are black. Only approximately 15–20% of its clerical employees are black. In comparison, approximately 75% of the hospital's Service/Maintenance workers are black. Of those blacks hired into clerical positions, the vast majority are in the lowest paid categories of clerical salaries.

**8.**

Plaintiff was offered the position of Nursing Assistant in March 1982 and was employed from March 24, 1982 until October 8, 1982 in the Coronary Care/Medical Intensive Care unit. Plaintiff was hired at the rate of $3.53 per hour. If he had been hired in a clerical position he would have received $3.71 per hour.

*Promotion Claim:*

**9.**

Plaintiff applied for the position of Monitor Technician in July of 1982. He learned that the position was vacant from a co-worker who reported that Phillip Wright, Personnel Officer, had asked critical care unit employees on the second shift if they knew anyone who would be interested in a third shift Monitor Technician position.

**10.**

A monitor technician position has both clerical and technical functions and requires both technical and clerical skills. The primary responsibility of a monitor technician is to read patient monitors for the Cardiac Care Unit and note any arrhythmias. The monitor technician position requires the employee to learn and recognize arrhythmia patterns on a television screen. These patterns reflect the patient's heart patterns. Before an employee could function as a monitor technician, he had to take an arrythmia recognition class and pass the test.

**11.**

In April 1982, the plaintiff, on his own initiative, had taken and had completed the monitor technician course, but had failed the arrhythmia recognition exam. The course and test were generally not taken until after a person was hired to be a monitor technician but were requirements for the job position.

**12.**

In August 1982, Richard Worley, white male, was hired into a monitor technician slot in CCU. Worley was trained in the use and mechanics of the monitor, and he took the monitor technician class and passed the exam. Only after passing the

exam was he permitted to function independently as a monitor technician.

13.

At the time Worley was hired in August 1982, plaintiff was the only male nursing assistant in CCU on the third shift. The defendant felt it was not timely nor was it efficient from a business standpoint to move him into another position. Additionally, the position of monitor technician required the employee holding the position to be patient and tolerant of others. Plaintiff had previously been evaluated as needing improvement in interpersonal skills.

14.

■ The court finds that plaintiff was not promoted because of legitimate, nondiscriminatory reasons and not because of his race. Furthermore, after Worley was hired into the monitor technician slot, the plaintiff's supervisor Charlene Lucas scheduled the plaintiff to begin ICU technician training for promotion to ICU technician. Plaintiff had been informed earlier by Ms. Lucas that he would be scheduled to take ICU Tech training. The ICU technician was a higher paying job than that of monitor technician. Ms. Lucas came into the hospital on her off time to train plaintiff for the position. This training occurred before the formal ICU technician training class began. Ms. Lucas was trying to give the plaintiff a head start so that he would do well in the class.

15.

Plaintiff filed a grievance over his non-promotion to Monitor Technician. Plaintiff specifically alleged in his grievance that he believed that his race was a factor in the decision not to promote him.

*Retaliation and Discharge Claim:*

16.

The Hospital's coronary care unit (CCU) is charged with the responsibility of taking care of critically ill patients who have had heart attacks, or who have a history or prognosis of being unstable, or who have other critical or serious illnesses. In addition, patients who are on Code, *i.e.*, those who have suffered respiratory arrest, or cardiac arrest, are transferred to CCU. From a clinical standpoint, patients in CCU require constant care. Even slight disturbances or disruptions in their environment can result in serious problems to their health, and can hinder their recovery.

17.

Before he began his job duties, plaintiff went through an orientation course which lasted for approximately a day and one-half. During orientation, plaintiff received a copy of the Hospital's disciplinary guidelines policy as well as a job description for nursing assistant. The written job description for Critical Care Unit Nursing Assistant, dated January, 1982, states that the nursing assistant is required to "check patients' rooms for cleanliness and help the nurses clean the rooms and empty trash." The job description entitled "Nurse Aides-CCU" also states that the nursing assistant is responsible for checking patients' rooms for cleanliness and helping the nurses clean the rooms and empty trash. The nursing assistant is also required in part to: check empty rooms for proper admission set-up; set up rooms for admission; check the respiratory therapy closet and restock; help bathe and turn patients; answer patients' call lights; run errands for nurses in the unit to the kitchen, pharmacy, etc.; report to the charge nurse and perform duties as assigned by the charge nurse.

18.

The defendant Hospital has a progressive discipline system which requires that employees be warned about conduct which is not serious enough to require immediate discharge. Each new infraction within a one year period leads to a more serious form of discipline.

19.

The Hospital's policy is to hire all employees on a 90-day probationary basis. Under the probationary period policy, if an employee is deficient in his or her job performance or work habits, he or she may be terminated at any time during the 90-day period without notice. Plaintiff was evaluated during this period as needing improve-

ment in interpersonal skills but was not discharged. Plaintiff's reevaluation on or about July 1, 1982 again showed interpersonal problems. Plaintiff was described as demonstrating an aura of superiority which created misunderstandings and ill feelings.

20.

On August 29, 1982, plaintiff received an oral warning regarding his failure to complete an assigned task. On this date, plaintiff reportedly refused to empty the trash cans in his department. When asked to empty the cans, plaintiff denied that it was in his job description. Lucas had previously received complaints concerning plaintiff's job performance and lack of productive behavior. She had previously counseled with plaintiff concerning these problems. As a result of this incident and the complaints she had received, Lucas issued an oral warning to plaintiff. Plaintiff was told that if his conduct did not change, written warnings would follow and he would be subject to dismissal. A copy of the writeup concerning the circumstances leading to this oral warning was later placed in plaintiff's personnel file.

21.

■ On September 9, 1982, plaintiff received a written warning as a result of an incident involving a co-worker. It was reported to the third shift assistant head nurse, Patricia MacFarlane, that plaintiff called staff nurse, Marianne Ehrhart, a "bitch" and ignored her request for plaintiff to put a patient back to bed. On or about September 13, a meeting was held among Lucas, MacFarlane, and plaintiff. In this meeting, plaintiff denied calling his co-worker a "bitch", but admitted he did call her a "witch". During the meeting, plaintiff's behavior at work was discussed. He was told that regardless of which word was used, his conduct toward this co-worker was totally unacceptable and unprofessional. Plaintiff was given an opportunity to write his version of the incident. Plaintiff admitted in his written statement that he did call the nurse a "witch". He was also informed that the incident had been written up and would be placed in his per-

sonnel file as his first written warning. The evidence showed that employees on the staff were required to deal with all patients, regardless of sex, and that plaintiff was aware of this requirement. On the stand, plaintiff testified that he used the word "witch" as good-natured kidding and not as an insult. Plaintiff's testimony in this respect is not credible.

22.

On September 15, 1982, plaintiff received a second written warning for unprofessional conduct and the use of obscene language. Plaintiff told supervisor MacFarlane that a fellow worker, Patricia Parker, a black female, had sworn at him. Reports also reached MacFarlane that plaintiff had sworn at Ms. Parker first, using the expletive "fuck it". Subsequently, Ms. MacFarlane met with both Parker and plaintiff in the conference room and heard both sides of the story. MacFarlane requested that each employee write up his or her version of the incident and then present them to her. Plaintiff admitted on the stand that he did get into a heated and loud argument with Ms. Parker and had used profanity in a patient care area. MacFarlane reprimanded both employees for their unprofessional conduct in the nursing and patient care area. She informed plaintiff that she was giving him a second written warning. When the incident was reported to Assistant Administrator-Nursing Services, Mary Lynn Faress, she recommended that plaintiff be suspended for three days without pay. Plaintiff was warned on or prior to a meeting on September 16 of impending dismissal should another incident occur after his return to work.

23.

The events which led to plaintiff's termination occurred on the night of October 6 and the morning of October 7, 1982. Plaintiff was discharged for deficiencies in plaintiff's performance including failure to properly set up hospital rooms for patients, failure to properly check and stock the respiratory closet, taking an unauthorized thirty-minute break when a nurse asked

him to get a life care pump for an unstable patient, and neglect of other duties. On the stand plaintiff admitted that the above occurred while giving his explanation of the events in question.

■ On October 8, 1982, plaintiff met with Assistant Head Nurse Patricia MacFarlane, Assistant Director of Nursing Services Janis Kish and CCU Clinical Supervisor Charlene Lucas, and discussed the events of October 7. After the meeting, plaintiff was discharged. The court finds that the above events occurred and that plaintiff neglected his duties. Defendant acted on a reasonable belief that the plaintiff had in fact failed to perform several of his assigned duties.

### 24.

Before he was discharged, plaintiff was given an oral warning, two written warnings, and a suspension. Plaintiff was discharged on October 8, 1982 for ineffective performance of his assigned duties. The evidence shows that non-minority employees have been discharged by the Hospital for ineffective performance of assigned duties.

### 25.

The testimony revealed that the plaintiff was surly, rude and uncooperative. After hearing all the testimony and reviewing the record, the court is convinced that the plaintiff was discharged because of his poor performance and not because of his race. Neither was plaintiff retaliated against for filing his grievance. Plaintiff's testimony and own version of the events in question is simply not believable. The plaintiff testified on rebuttal. During cross-examination his testimony to a large extent completely destroyed his credibility as to most disputed matters. The court therefore finds and concludes as to all major issues in dispute that the plaintiff is not worthy of belief.

### CONCLUSIONS OF LAW

The court has jurisdiction over this action under 28 U.S.C. § 1343, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution. Plaintiff has met the necessary conditions precedent to suit under Title VII by filing a timely charge with the Equal Employment Opportunity Commission and by filing this action within 90 days of his receipt of Notice of Right to Sue from the Commission.

■ For the reasons set forth in *Gilbert v. West Georgia Medical Center, Inc.*, 629 F.Supp. 738 (N.D.Ga.1985), the court concludes that the defendant is subject to suit under 42 U.S.C. § 1983 as a public entity acting under color of law.

■ The plaintiff has made out a *prima facie* case as to the initial hiring claim. "The failure to establish 'fixed or reasonably objective standards and procedures for hiring' is a discriminatory practice." *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir.1984) (cits. omitted). "When an employer uses ... informal methods it has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest." *Id.* The false assumption that someone is not interested in the position is not necessarily a defense. *Harris v. Birmingham Board of Education*, 712 F.2d 1377, 1383 (11th Cir.1983). The defendant has not offered any legally sufficient nondiscriminatory reason for its failure to hire plaintiff into a clerical position. The defendant has failed to meet its burden of articulation and therefore the court finds in favor of the plaintiff on this issue.

■ On the remainder of the plaintiff's claims, the court finds in favor of the defendant. Under the principles established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), even assuming that the plaintiff has set forth a *prima facie* case, the defendant has articulated a legitimate, non-discriminatory reason for the actions taken. The ultimate burden of persuasion in this case

remains with the plaintiff at all times. *Lincoln v. Board of Regents,* 31 FEP 22, 26 (11th Cir.1983). The court is not satisfied that the plaintiff has carried his burden. The court is convinced that the failure to promote and the eventual decision to discharge were not taken because of plaintiff's race. Nor does the evidence establish that defendant's articulated reasons were a mere pretext for discrimination. The defendant's reasons for failing to promote and discharge the plaintiff are both legitimate and credible. The evidence overwhelmingly indicates that the plaintiff had a poor attitude and could not get along with his supervisors and fellow employees. Plaintiff's problems in this area began almost immediately upon his hiring. Indeed, plaintiff's own witness, Willie Edmondson, testified about incidents where plaintiff refused to perform tasks, used profanity, and had problems with other staff members both black and white. The defendant followed established procedures for progressive discipline. No retaliation because of plaintiff's grievance existed. Each of the steps in the disciplinary actions taken against the plaintiff was justified by the incidents in which the plaintiff was involved.

 The court is also satisfied that the defendant has not violated plaintiff's equal protection or due process rights. Other white as well as black employees who were unable to effectively perform their duties were discharged. Any distinction, if any, between plaintiff's treatment and other selected individuals was not because of plaintiff's race and does not rise to the level of a constitutional deprivation of equal protection. Neither were defendant's actions so arbitrary and capricious as to violate substantive due process.

 Because the plaintiff prevailed on his hiring claim, he is entitled to the salary he would have received from the time he should have been hired until the time he was actually hired. The court determines January 11, 1982 to be an appropriate starting time that plaintiff could have been hired as on that date the defendant hired two lesser qualified white applicants into clerical positions. As the starting salary of the sought-after clerical position was higher than the nurse's aid salary, the plaintiff is also entitled to the difference in salaries until his discharge.

Based on Finding of Fact # 8:

January 11, 1982 to March 23, 1982 is 53 working days.

53 × 8 is 424 hours.

424 × \$3.71 is \$1,573.04.

March 24, 1982 to October 8, 1982 is 141 working days.

141 × 8 is 1128 hours.

\$3.71 − \$3.53 is \$.18.

1128 × \$.18 is \$203.04.

The plaintiff is awarded \$1,573.04 + \$203.04 = \$1,776.08. Although the facts and circumstances behind the defendant's hiring system necessitate an award for the plaintiff, in the court's opinion the harm done to the plaintiff was neither intentional nor aggravated, such that further compensatory or punitive damages are neither necessary nor appropriate under the facts of this case. In all other aspects, the court finds for the defendant and the Clerk is directed to enter judgment accordingly.

### ON MOTIONS TO AMEND

The above-styled matter is presently before the court on both the plaintiff's and the defendant's motions to amend the judgment of this court of July 10, 1985. The parties agree that Finding of Fact No. 8 should be changed to reflect the additional \$0.17 per hour shift differential the plaintiff received while working as a Nurse's Assistant. Accordingly, the \$3.53 per hour figure in Finding of Fact No. 8 is amended to read \$3.70 per hour. Additionally, the parties agree that the plaintiff's hiring claim was not before this court under Title VII. Therefore, a sentence is added to page 12 of the court's July Order. The new sentence will be added at the end of the first paragraph of the Conclusions of Law and will read: "The plaintiff's hiring claim is before this court under 42 U.S.C. §§ 1981 and 1983."

Finally, both sides suggest changes on computing the amount of plaintiff's recovery under his hiring claim. The claim on which the plaintiff has prevailed was added by plaintiff late in the case and shortly before trial. For this and other reasons, the court concludes that in the exercise of its discretion prejudgment interest should not be awarded. The plaintiff's request for prejudgment interest is therefore denied. Likewise the defendant's request that the court include the plaintiff's raise on July 11, 1982 is denied. The plaintiff's request that the court raise the potential clerical salary to include a shift differential bonus and the defendant's counter argument to lower the figure are both denied. Because, though, the court has amended and increased the Nurse's Assistant salary figure from $3.53 to $3.70 per hour, the plaintiff's award is amended and decreased to $1,584.32. All other requests to amend judgment are denied and overruled.